# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**Lee H. Pulsifer and Laura L. Pulsifer,**

        Debtors.     **Bankruptcy Case No. 12-36562-svk**

**LEE H. PULSIFER and LAURA L. PULSIFER,**

        Plaintiffs,     **Adv. Proc. No. 13-02176-svk**

    -vs-     **Case Nos. 13-C-648, 13-C-835**

**U.S. BANK, NATIONAL ASSOCIATION,**
as Trustee for Citigroup Mortgage Pass-Through
Certificates Series 2007-AR4, and
**WELLS FARGO HOME MORTGAGE,**

        Defendants.

**MARY B. GROSSMAN, Standing Chapter 13 Trustee,**

        Additional Party.

## DECISION AND ORDER

In two orders, the Court withdrew the reference of these matters from the bankruptcy court; consolidated proceedings in the lower-numbered case; granted-in-part and denied-in-part the defendants' motion to dismiss; and granted the plaintiffs' motion for leave to file an amended complaint. October 31, 2013 Decision and Order, ECF No. 4; January 8,

2014 Decision and Order, ECF No. 10. Now before the Court are cross-motions for summary judgment. Also before the Court is the plaintiffs' motion to reconsider the Court's dismissal of their claim for breach of the duty of good faith and fair dealing.

For the reasons that follow, the plaintiffs' motions for reconsideration and for summary judgment are denied, and the defendants' motion for summary judgment is granted. The Court will enter judgment in favor of the defendants and remand this matter to the bankruptcy court for further proceedings consistent with this opinion.

## Background

On December 19, 2005, the plaintiffs, Lee and Laura Pulsifer, executed a Note and Mortgage in favor of Wells Fargo Bank, N.A. in the principal amount of $470,250.00. The Pulsifers subsequently executed a Modification of Mortgage on October 20, 2006, pursuant to which they agreed to increase the principal balance to $480,250.00. On December 19, 2006, they executed a Permanent Loan Addendum Amending Note, which further increased the principal balance to $498,750.00. U.S. Bank is the assignee of the Pulsifers' mortgage.

In August of 2007, Lee Pulsifer lost his job. Shortly thereafter, Laura Pulsifer's income was decreased by approximately 50%. Lee Pulsifer

found a new job in mid-2008, but his salary was approximately 30% less than he had earned in his prior position. The Pulsifers used their savings and 401(k) investments to sustain their monthly expenses while Lee Pulsifer was out of work. The Pulsifers' savings and other available funds were depleted by late 2008.

On June 16, 2009, Wells Fargo offered the Pulsifers a non-HAMP[1] loan modification. The Pulsifers rejected this offer because they wanted a loan modification that would have reduced their total monthly payment to no more than $3,000 per month.

In September 2009, the Pulsifers could not continue making their mortgage payments, which totalled $3,700 per month, including amounts for mortgage insurance, property insurance, and property taxes. On October 6, 2009, the Pulsifers called Wells Fargo to inquire about a loan modification under HAMP. During that call, the Pulsifers provided Wells Fargo with verbal information regarding their income and expenses. On October 7, 2009, Wells Fargo mailed the Pulsifers a HAMP loan modification application packet. The first page of the packet stated, "You may not qualify for this loan modification program," and also, "If you qualify under the federal government's Home Affordable Modification

---

[1] The Home Affordable Modification Program, discussed below.

Program and comply with the terms of the Trial Period Plan, we will modify your mortgage. . . ." The second page of the application packet requested that the Pulsifers provide a number of documents to "see if you qualify for a Home Affordable Modification." The third page of the application stated, "[the Plan] is the first step. Once we are able to confirm your income and eligibility for the program, we will finalize your modified loan terms. . . ."

The application packet included a document titled Loan Trial Period Plan ("TPP"). Section 2.F of the TPP provided that the Pulsifers' loan would not be modified unless the Pulsifers were provided with a fully-executed copy of the TPP. The Pulsifers signed the TPP on October 26, 2009 and returned it to Wells Fargo. Wells Fargo did not execute the TPP or provide the Pulsifers with a fully-executed copy of the document.

The TPP provided that the Pulsifers should make three payments of $2,108 during the term of the Plan as one condition before a permanent modification would be offered. The Pulsifers made three payments to Wells Fargo in the amount of $2,108 in November 2009, December 2009, and January 2010. After these payments were complete, the Pulsifers received a letter from Wells Fargo dated January 6, 2010, which stated: "Wells Fargo Home Mortgage has pre-qualified you for a loan modification

program and mailed you a package of materials including a loan modification agreement that you need to sign." The Pulsifers never received the packet referred to in this letter.

Between February, 2010 and October, 2010, Wells Fargo repeatedly told the Pulsifers that they were working on the loan modification paperwork. Wells Fargo also advised the Pulsifers to keep making their regular TPP payments, which the Pulsifers continued to make through November, 2010.

The Pulsifers were aware that interest was continuing to accrue on their mortgage while their loan modification application was pending. The Pulsifers understood that if they were offered a permanent loan modification, the monthly payment under such a modification could be higher than $2,108. They further understood that their application for a loan modification could be denied even if they made the payments under the TPP. Wells Fargo never advised the Pulsifers that they were guaranteed to be offered a permanent loan modification.

On September 22, 2010, Wells Fargo sent the Pulsifers a letter stating that their application for a HAMP modification had been denied. The letter explained: "we are unable to adjust the terms of your mortgage through the Home Affordable Modification Program because we service

your loan on behalf of an investor or group of investors that has not given us the contractual authority to modify your loan . . ." Moreover, Wells Fargo used the HAMP decisioning tool created by the Department of the Treasury, which showed that the Pulsifers' loan had a negative net present value ("NPV") — "that is, the value of the modified mortgage would be lower than the servicer's expected return after foreclosure." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 557 (7th Cir. 2012). Because the NPV was negative, Wells Fargo was required to submit a claim to the mortgage insurer for the Pulsifers' loan before it could offer the Pulsifers a permanent loan modification. This claim was denied.

U.S. Bank commenced foreclosure proceedings in Wisconsin state court in February, 2011. The Pulsifers filed for bankruptcy under Chapter 13 on November 20, 2012.

## Analysis

### I. Motion to reconsider

The Pulsifers move to reconsider the dismissal of their claim for breach of the duty of good faith and fair dealing under Federal Rule of Civil Procedure 60(b). This rule, like Rule 59(e), generally governs post-judgment motions. *Jackson v. McKay-Davis Funeral Home*, No. 07-C-737, 2012 WL 5423739, at *1 (E.D. Wis. Nov. 6, 2012). However, district judges

have inherent authority to reconsider an interlocutory order because such orders are subject to revision at any time before the entry of judgment. Fed. R. Civ. P. 54(b); *Farr v. Paikowski*, No. 11-C-789, 2013 WL 1288041, at *1 (E.D. Wis. March 25, 2013).

The Court dismissed this claim because a TPP under HAMP is an offer which, if accepted, could form the basis for an enforceable contract "only if the loan servicer actually executed the TPP." *In re Pulsifer*, 2014 WL 61230, at *2 (E.D. Wis. Jan. 8, 2014) (discussing *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012)). In *Wigod*, Wells Fargo "countersigned" the TPP and "mailed a copy to Wigod with a letter congratulating her on her approval for a trial modification. In so doing, Wells Fargo communicated to Wigod that she qualified for HAMP and would receive a permanent 'Loan Modification Agreement' after the trial period, provided she was 'in compliance with this Loan Trial Period and [her] representations . . . continue[d] to be true in all material respects.'" *Id.* at *2 (quoting *Wigod*, 673 F.3d at 562). Unlike in *Wigod*, "Wells Fargo did not execute the Pulsifers' TPP. Thus, there was no 'unilateral offer to modify' the Pulsifers' loan 'conditioned on [their] compliance with the stated terms of the bargain.' . . . Without a valid offer, there can be no underlying contract, and without an underlying contract, the Pulsifers'

claim for breach of the duty of good faith and fair dealing necessarily fails." *Id.* at *3 (internal citations omitted).

The Pulsifers argue, again, that an unexecuted TPP can reasonably be interpreted as an offer to modify their loan, so long as they complied with the conditions of the TPP. This is a non-starter; Section 2.F of the TPP states: "If prior to the Modification Effective Date, (i) *the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; . . . the Loan Documents will not be modified and this Plan will terminate.*" Wells Fargo conditioned its promise to modify the Pulsifers' loan on its *own* future action or approval; thus, "there is no binding offer." *Wigod* at 561.

The Pulsifers also argue that the TPP was an offer to *process* their application for a loan modification, which the Pulsifers accepted by complying with the various requirements of the TPP. The question then becomes, as the Pulsifers argue, whether Wells Fargo breached the implied duty of good faith and fair dealing by failing to process the Pulsifers' application in compliance with HAMP guidelines.

When the issue is framed as such, it becomes clear that the Pulsifers have no cause of action. Home loan servicers, such as Wells Fargo, undertake their HAMP obligations voluntarily via contract with the

Department of the Treasury. *Speleos v. BAC Home Loans Servicing, L.P.*, 937 F. Supp. 2d 177, 182 (D. Mass. 2013) ("Pursuant to HAMP, mortgage loan servicers enter into Servicer Participation Agreements with Fannie Mae that require the servicer to perform loan modification and foreclosure prevention services as specified in the HAMP Guidelines"). As the Seventh Circuit observed in *Wigod*, "Congress did not create a private right of action to enforce the HAMP guidelines, and since *Astra* [*USA, Inc. v. Santa Clara Cnty.*, --- U.S. ---, 131 S. Ct. 1342 (2011)], district courts have correctly applied the Court's decision to foreclose claims by homeowners seeking HAMP modifications as third-party beneficiaries of SPAs." 673 F.3d at 559, n.4. Therefore, the Court must reject the Pulsifers' attempt to enforce the HAMP guidelines under the guise of a claim sounding in contract.

## II.     Summary judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Cross-motions for summary judgment must be analyzed by "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party." *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014).

These motions are directed towards the Pulsifers' claims for negligence and promissory estoppel.

### A. Promissory estoppel

Promissory estoppel has three elements: (1) the promise was one for which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) the promise did induce such action or forbearance; and (3) injustice can be avoided only by enforcement of the promise. *Aguilar v. Husco Int'l, Inc.*, 851 N.W. 2d 802, 810 (Wis. Ct. App. 2014). Such a claim is an "alternative basis to breach of contract for seeking damages from the breakdown of a relation. If there is a promise of a kind likely to induce a costly change in position by the promisee in reliance on the promise being carried out, and it does induce such a change, he can enforce the promise even though there was no contract." *Cosgrove v. Bartolotta*, 150 F.3d 729, 732 (7th Cir. 1998) (applying Wisconsin law); *see also, Wigod* at 566 (promissory estoppel is "an alternative means of obtaining contractual relief under Illinois law").

The Pulsifers do not argue that Wells Fargo promised them a loan modification. Instead, the Pulsifers argue that Wells Fargo promised to follow the HAMP guidelines when processing their application. This strikes

the Court, once again, as an attempt to work-around the lack of a private cause of action to enforce the HAMP guidelines. Put simply, the Pulsifers cannot enforce Wells Fargo's promise to follow the HAMP guidelines; this promise was made by Wells Fargo to the federal government. Wells Fargo never promised the Pulsifers that it would abide by the HAMP guidelines.

Moreover, it is difficult to imagine how the Pulsifers could have relied, to their detriment, on such a promise, express or implied. The Pulsifers admit that they "did not know exactly what Wells Fargo was doing, what it was supposed to do or what steps or calculations Wells Fargo needed to do to process the loan modification at that time, . . ." Affidavit of Lee Pulsifer, ¶ 23. Instead, Lee Pulsifer states that he is "*now* aware that the Department of the Treasury had issued directives that Wells Fargo was supposed to follow when processing the loan modification." *Id.* (emphasis added). Therefore, the Pulsifers were not acting under the assumption that Wells Fargo would do anything in particular in evaluating their request for a loan modification. At best, Wells Fargo promised the Pulsifers that it would process their application. Thus, they were "investing for a chance, rather than relying on a firm promise that a reasonable person would expect to be carried out, . . ." *Bartolotta*, 150 F.3d at 733.

Finally, even if Wells Fargo made an actionable promise to follow

the HAMP guidelines while processing the Pulsifers' complaint, enforcing such a promise would not remedy any sort of injustice. The Pulsifers offer no evidence to suggest that they are actually entitled to a HAMP modification, and their renewed application was already denied. Lee Pulsifer Aff., ¶ 29. The Court will not order Wells Fargo to engage in playacting. *See Baures v. North Shore Fire Dep't*, 664 N.W. 2d 113, 125 (Wis. Ct. App. 2003) ("whatever injustice Lt. Baures has suffered would not be remedied by ordering the Department to engage in a new selection process that, reaching the same result, would seem to be little more than a charade").

### B. Negligence

The Pulsifers argue that Wells Fargo's failure to adhere to the HAMP guidelines amounts to ordinary negligence. For many of the reasons already stated, courts have held that HAMP guidelines do not impose a state tort law duty of care. *Mackenzie v. Flagstar Bank, FSB*, 738 F.3d 486, 496 (1st Cir. 2013); *Spaulding v. Wells Fargo Bank, N.A.*, 714 F. 3d 769, 780 (4th Cir. 2013); *Ahmad v. Wells Fargo Bank, N.A.*, 861 F. Supp. 2d 818 (E.D. Mich. 2012) ("because of the overwhelming case law finding that plaintiffs do not have a private right of action to sue for a violation of HAMP . . . courts should be reluctant to allow plaintiffs to recast these

claims — involving alleged failures to conform to the provisions of HAMP – as tort violations").

Even if Wells Fargo did owe the Pulsifers a duty of care pursuant to the HAMP guidelines, the Pulsifers cannot prove a causal connection between Wells Fargo's breach and their failure to obtain a loan modification. *Strasser v. Transtech Mobile Fleet Service, Inc.*, 613 N.W. 2d 142, 150 (Wis. 2000) (listing elements for ordinary negligence). For example, the Pulsifers complain that Wells Fargo failed to notify them of a negative NPV calculation, arguing that they were deprived of an opportunity to contest the calculation. To succeed on such a claim, the Pulsifers must prove that they could have successfully contested the calculation, that the modified calculation would have been positive, and that the investor for the loan would have approved the modification. Indeed, investor approval is required, and even a positive NPV value does not guarantee a modification. Thus, at bottom, the Pulsifers must somehow demonstrate that the investor for their loan would have approved a modification if the HAMP guidelines had been precisely followed. This they cannot do.

Finally, the Pulsifers bring a claim for negligent misrepresentation. The elements for such a claim are: (1) the defendant made a representation

of fact; (2) the representation was untrue; (3) the defendant was negligent in making the representation; and (4) the plaintiff believed that the representation was true and relied on it. *Malzewski v. Rapkin*, 723 N.W. 2d 156, 163 (Wis. Ct. App. 2006). The Pulsifers complain that Wells Fargo told them that it would accept and then process their application, but this representation was completely true. It is undisputed that Wells Fargo spent months processing the Pulsifers' application. Even if the Pulsifers could identify a factual misrepresentation, creditors do not owe a duty of care to debtors, and for the reasons stated above, such a duty cannot be imported from the HAMP guidelines. *See, e.g., Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 252 (2d Cir. 1985) (a plaintiff "may not recover for negligent misrepresentation unless 'the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all. . . .' An ordinary creditor-debtor relationship between bank and customer does not create such a duty of care"); *see also Thompson v. Bank of Am., N.A.*, No. 3:13-CV-2120-B, --- F. Supp. 2d ----, 2014 WL 1373505, at *12 (N.D. Tex. Apr. 7, 2014) ("Not only does no special relationship exist between a mortgagor and a mortgagee, but courts have held that there is no duty of care between them that would give rise to a negligence claim").

### III. Further proceedings

The Pulsifers' remaining claims relate to standing. As the Court wrote on January 10,

> this is not the proper forum to adjudicate the Pulsifers' claims with respect to U.S. Bank's alleged lack of standing or interest in the underlying Chapter 13 proceedings. Standing is typically a threshold issue, but the focal point of the Pulsifers' adversary complaint is Wells Fargo's alleged actions or inactions as the loan servicer. Despite the assignment to U.S. Bank, the parties appear to agree that Wells Fargo was the loan servicer at all relevant times. . . . Once the Pulsifers' claims are resolved, the bankruptcy court can make a ruling on U.S. Bank's standing, if necessary.

ECF No. 10, at 8. Therefore, the Court will remand this matter to the bankruptcy court for further proceedings.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' motion for reconsideration [ECF No. 21] is **DENIED**;

2. Plaintiffs' motion for summary judgment [ECF No. 19] is **DENIED**;

3. Defendants' motion for summary judgment [ECF No. 26] is **GRANTED**;

4. The Clerk of Court is directed to enter judgment in favor of the

defendants on the plaintiffs' claims for breach of the duty of good faith and fair dealing, promissory estoppel and negligence; and

5. This matter is **REMANDED** to the bankruptcy court for further proceedings consistent with the foregoing opinion.

Dated at Milwaukee, Wisconsin, this 23rd day of September, 2014.

BY THE COURT:

_Rudolph T. Randa_
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**